UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | | |
|---|---|---|
| ATIUM COLY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 4:26-CV-8-PPS-APR |
| | ) | |
| NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Atium Coly started at right tackle for Purdue's football team during the 2025 college football season. His journey to becoming a starter on the offensive line of a Division I program is nothing short of remarkable. Coly had never played a snap of football in his life when he began his collegiate career at a National Association of Intercollegiate Athletics ("NAIA") institution. After two years, he transferred to Purdue, sat out a redshirt season, and then played the last two seasons. Though he spent the first two years of his collegiate playing career at a non-NCAA institution, one of which was significantly disrupted by COVID-19, Coly now finds himself at a crossroads. Under the current NCAA rules, he has exhausted his NCAA eligibility.

Claiming the NCAA is violating antitrust laws with the enforcement of its eligibility rules, Coly seeks a preliminary injunction to suspend the applicable NCAA rules so he can play another season of college football. Unfortunately, Coly has not presented the Court with any economic evidence or analysis demonstrating that the

1

eligibility rules amount to an undue restraint of trade under the Sherman Act. Indeed, he has presented virtually no evidence at all. More importantly, binding adverse precedent from the Seventh Circuit involving a similarly situated college football player from Wisconsin who was denied a preliminary injunction on appeal stands firmly in Coly's way. Consequently, and regrettably, his request for a preliminary injunction must be denied.

## Background

*The NCAA's Eligibility Rules*

First, a brief overview of the applicable NCAA eligibility rules at issue here. The NCAA is a self-governing organization of colleges, universities, and conferences that is responsible for regulating intercollegiate athletics. [DE 1 at ¶16.] Approximately 350 of the NCAA's 1,100 schools compete in Division I athletics. [*Id.* at ¶17.] For college football, the DI level is further divided into the Football Bowl Subdivision ("FBS") and Football Championship Subdivision ("FCS") levels. [*Id.* at ¶¶17, 79.] The NCAA began over a century ago as a small, nonprofit organization but has since grown into a massive business. The NCAA now generates over one billion in annual revenue, inks multi-billion-dollar media contracts to televise games and competitions, and its member schools and athletic conferences independently generate billions of dollars in revenue. [*Id.* at ¶18.] To show how gargantuan sums of money have infiltrated college sports, take a look at Indiana University basketball as an example. According to one report,

Indiana University had a total operating budget of $32 million this year—for men's basketball alone.[1]

Layered on top of this is the recent proliferation of name, image, and likeness ("NIL") deals for individual players, which for 2024 was projected as a $1.1 billion market for college football alone. [*Id.* at ¶32.] It is reported, for example, that University of Texas quarterback Arch Manning has secured NIL deals worth over $5 million for the upcoming 2026 college football season.[2] By contrast, it wasn't that long ago that SMU received the so-called death penalty—the total cancellation of its football program—because it paid its players under the table the rather quaint sum of $61,000.[3] So yes, times have indeed changed.

The NCAA governs college sports through its NCAA Constitution and Bylaws. [*Id.* at ¶20.] Three Bylaws are relevant here. The first is Bylaw 12.6, the "Five-Year Rule", which states:

> **12.6.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution . . . .
>
> **12.6.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five year rule, a student-athlete shall be considered registered at a collegiate institution . . . when the student-athlete initially registers in a regular term (semester or quarter) of an academic year

---

[1] Connor Grootenhuis, *Hoosier's massive basketball budget still can't buy a ticket to March*, Hoosier St. of Mind, Mar. 16, 2026, https://hoosierstateofmind.com/hoosiers-massive-basketball-budget-still-can-t-buy-a-ticket-to-march-01kkvmdw68q2 (last visited Mar. 21, 2026).

[2] Nick Shultz, *Texas QB Arch Manning signs NIL deal with Google Gemini*, Yahoo Sports, Mar. 19, 2026, https://sports.yahoo.com/articles/texas-qb-arch-manning-signs-181327196.html (last visited Mar. 21, 2026)

[3] Dave Wilson, *'Oh, s---, here come all the billionaires': How SMU came back from the dead*, ESPN, Dec. 17, 2024, https://www.espn.com/college-football/story/_/id/41136586/smu-football-acc-death-penalty-return-2024 (last visited Mar. 21, 2026)

for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term[.]

[DE 1-4 at 58.]

NCAA Bylaw 14.02.4 defines a "collegiate institution" as an institution of higher education that, in part, "[i]s accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree"; or "[c]onducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree." [*Id.* at 146.] This broad definition includes non-NCAA member institutions such as those within the NAIA.

The second relevant rule is NCAA Bylaw 12.02.3, the "Intercollegiate Competition Rule." The Intercollegiate Competition Rule operates in tandem with the "Five-Year Rule" to establish the so-called "Four-in-Five" framework in which a student-athlete is eligible to play four seasons of competition across five years. The Five-Year Rule, Bylaw 12.6, forbids a student athlete from engaging in "in more than four seasons of intercollegiate competition in any one sport[.]" [*Id.* at 58.] The Five-Year Rule cross-references the Intercollegiate Competition Rule, which defines "intercollegiate competition" to include "represent[ing] the institution against outside competition", "compet[ing] in the uniform of the institution" or using school issued apparel, or competing and receiving expenses from the institution for competition. [*Id.* at 47–48.]

Finally, there is the "Rule of Restitution." This is NCAA Bylaw 12.9.4.2, which provides:

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions.

[*Id.* at 69.] The list of punishments is serious. It includes vacating individual records, vacating team records or wins, the return of individual and team awards, disqualifying an institution from participation in NCAA championships or tournaments, and even a requirement that institutions remit to the NCAA certain monies from TV deals. [*Id.* at 70.]

*Coly's Football Career*

Coly grew up splitting time between West Africa and the United States. [DE 1 at ¶46.] In high school, Coly learned of the opportunities that college sports could provide, including in the form of athletic scholarships. [*Id.* at ¶47.] Coly enrolled at NAIA-affiliate Lawrence Technological University for the Fall of 2021. [*Id.* at ¶49.] Despite never having played a snap of football at any level before in his life, Coly joined Lawrence's football team. [*Id.* at ¶48–49.] The COVID-19 pandemic disrupted Coly's 2021 season, resulting in three cancelled games and his absence from two additional games after he contracted the virus. [*Id.* at ¶50.] Coly played in fewer than half of the

originally scheduled ten games. [*Id*.] The following year—2022—Coly played the entire season for Lawrence Tech without disruption and started to show tremendous promise as a budding offensive lineman. [*Id.* at ¶54.]

This is when Purdue came calling. After his second season of college football at Lawrence Tech, Coly attracted the attention of the coaches at Purdue University, a NCAA Division I FBS program, which of course plays in the mighty Big Ten. (In the past, one might argue whether the Big Ten was the best football conference in the country, but that argument was soundly put to rest this past year.) Coly transferred to Purdue in 2023. [*Id.* at ¶55.] With all due respect to the young men who play for Lawrence Tech, the leap that Coly made from Lawrence to Purdue is almost unfathomable. But that Coly was able to do it is mostly explained by his grit, his tremendous athletic ability, and his Big Ten stature. He's listed at 6'7", 300 pounds.[4]

Because Coly had scarcely played any football at all, his coaches at Purdue redshirted him for the 2023 season to aid his development and ease the giant leap he took going from NAIA level play to a DI program. [*Id*.] Coly played his first full season of NCAA DI football during the 2024 season for Purdue. [*Id.* at ¶56.] He was named to the Academic All-Big Ten team that year. [*Id.*] Coly continued to develop as a player during the 2025 season. [*Id.* at ¶57.] By all accounts, Coly had a tremendous senior year. According to his bio on the Purdue Football website, Coly started all 12 games at right

---

[4] Purdue Sports, https://purduesports.com/sports/football/roster/player/bakyne-coly (last visited Mar. 21, 2026).

tackle, played 784 offensive snaps, earned CSC Academic All-District, and was again named Academic All-Big Ten.[5]

After the 2025 season, Coly had exhausted his NCAA eligibility under the "Four in Five" framework—two seasons playing at Lawrence Tech, one red-shirt year, and two seasons playing at Purdue. On December 18, 2025, Purdue submitted to the NCAA a request for a waiver on Coly's behalf to permit him to play another season at Purdue. [*Id.* at ¶60.] Coly's principal argument in seeking the waiver was his sub-optimal experience the first year at Lawrence due to the lingering effects of COVID. The NCAA denied Purdue's waiver request on January 13, 2026. [*Id.* at ¶61.] Coly then turned to the courts. He filed his Complaint and Motion for Temporary Restraining Order and Preliminary Injunction on February 20, 2026. [DE 1; DE 2.]

Coly brings three counts against the NCAA for alleged violations of the Sherman Act, Indiana antitrust law, and tortious interference with a prospective business relationship under Indiana law. Coly seeks to enjoin the NCAA from applying its eligibility rules that prevent him from participating in at least one more year of DI football and from imposing penalties on Coly or any institution he attends for seeking such injunctive relief. He also seeks monetary damages.

The Court held an initial status hearing on Coly's Motion for Temporary Restraining Order and Preliminary Injunction on February 27, 2026. [DE 19.] The Court held a second hearing, with the benefit of full briefing on Coly's Motion by the parties,

---

[5] Purdue Sports, https://purduesports.com/sports/football/roster/player/bakyne-coly (last visited Mar. 21, 2026).

on March 3, 2026. [DE 23.] No evidence was offered by either party at the hearing. Instead, the hearing was simply an oral argument based on the papers that had been submitted. Coly's Motion notes that Purdue's NFL Pro Day was scheduled to take place on March 4, 2026—the day after the hearing. [DE 1 at ¶69.] Coly explains that the NFL Pro Day is an opportunity for NFL scouts and coaches to visit a school and watch NFL-eligible players work out and perform drills in advance of the NFL Draft, which begins on April 23, 2026. [*Id.*] Unfortunately, given the timing of the motions and hearing, I was simply unable to make a ruling in the 24 hours I had between the end of the hearing on March 3rd and Purdue's Pro Day on March 4th.

## Discussion

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, Coly must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20; *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). The balance of equities analysis takes a sliding scale approach, meaning that "the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001); *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) ("This Circuit 'employs a sliding scale approach' for this balancing: if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a

plaintiff is to win the more that balance would need to weigh in its favor.") (citation omitted).

At the preliminary injunction stage, courts must "approach the record from a neutral and objective viewpoint, assessing the merits as we think they are likely to be decided after more complete discovery and litigation." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022). This standard differs from the motion to dismiss stage because courts do not give plaintiffs the benefit of accepting allegations as true or reasonable inferences in their favor. *Id.* at 791. Similarly, plaintiffs seeking a preliminary injunction are not given the benefit of conflicting evidence, as courts do in evaluating motions for summary judgment. *Id*. All in all, the preliminary injunction inquiry is a "decidedly far more searching inquiry than the question of whether a complaint properly alleges a claim for relief." *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 870 (7th Cir. 2025) (quoting *In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d 123, 134 (D.C. Cir. 2020)).

Because this case rises and falls on whether there is a likelihood of success on the merits, that is where I will focus my attention. Coly claims the NCAA's eligibility rules violate Section 1 of the Sherman Antitrust Act of 1890, which prohibits agreements "in restraint of trade or commerce[.]" 15 U.S.C. § 1. The Supreme Court has "long recognized" that the phrase "'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (quoting *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59–60 (1911)). The Supreme Court has understood Section 1 "to outlaw only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis

added). To establish a violation of Section 1, Coly must show: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 703 (7th Cir. 2021) (citation omitted)

To determine whether a restraint is "undue", the Supreme Court has established several different frameworks. The Supreme Court "presumptively applies rule of reason analysis[.]" *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Rule of reason analysis calls upon courts to "conduct a fact-specific assessment of market power and market structure" to assess the challenged restraint's "actual effect on competition." *Am. Express Co.*, 585 U.S. at 541 (internal citation omitted). The goal of this analysis is to distinguish "between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). The Parties agree the rule of reason analysis applies here, just as it did in an earlier case decided by the Seventh Circuit under similar circumstances. *See Fourqurean*, 143 F.4th at 868 (applying rule of reason analysis to a challenge to the same NCAA eligibility rules).

The Supreme Court has described the rule of reason analysis as a "three-step, burden-shifting framework[.]" *Am. Express Co.*, 585 U.S. at 541. Under this framework, Coly has the "initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id*. If Coly carries that burden, the burden then shifts to the NCAA "to show a procompetitive rationale for the restraint." *Id.* If the NCAA makes this showing, the burden again shifts back to

Coly "to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

Before analyzing whether the eligibility rules have a substantial anticompetitive effect, this Court must define the relevant market. "[T]he relevant market is defined as the area of effective competition" which is the "arena within which significant substitution in consumption or production occurs." *Id.* at 543 (citation omitted). Without defining the relevant market, "there is no way to measure [the NCAA's] ability to lessen or destroy competition." *Id.* (citation omitted). Defining the relevant market depends on the type of market alleged. "In the labor market context, as here, the market is comprised of those employers seen by workers as reasonably good substitutes." *Fourqurean*, 143 F.4th at 869. With these challenging legal standards established, I will first survey the district court and circuit court cases that have considered similar NCAA eligibility challenges.

District courts across the country have come out on both sides of the question of whether to grant preliminary injunctions in NCAA eligibility cases. *Contrast Blythe v. Nat'l Collegiate Athletic Ass'n*, Case No. 3:26-cv-100-ART-CSD, 2026 WL 483345 (Feb. 20, 2026) (granting preliminary injunction); *and Robinson v. Nat'l Collegiate Athletic Ass'n*, 803 F.Supp.3d 481 (N.D.W. Va. 2025) (granting preliminary injunction); *and Braham v. Nat'l Collegiate Athletic Ass'n*, 794 F.Supp.3d 824 (D. Nev. 2025) (granting preliminary injunction); *and Martinson v. Nat'l Collegiate Athletic Ass'n*, 804 F.Supp.3d 1109 (D. Nev. 2025) (granting preliminary injunction); *with Patterson v. Nat'l Collegiate Athletic Ass'n*, NO. 3:25-cv-00994, 2026 WL 115417 (M.D. Tenn. Jan. 15, 2026) (denying preliminary

11

injunction); *and Boyd v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00729, 2025 WL 2432200 (M.D. Tenn. Aug. 22, 2025) (denying preliminary injunction); *and Hasz v. Nat'l Collegiate Athletic Ass'n*, 8:25CV398, 2025 WL 2083853 (D. Neb. July 24, 2025) (denying preliminary injunction); *and Johnson v. Nat'l Collegiate Athletic Ass'n*, CV 25-60-M-KLD, 2025 WL 1790345 (D. Mont. June 26, 2025) (denying preliminary injunction).

As for the Courts of Appeal, only the Third and Seventh Circuits have addressed the merits of Sherman Act challenges to the NCAA's eligibility rules. The Sixth Circuit has also commented on this issue, though the procedural posture of that case was unique. I'll start, as I should, with the Seventh Circuit case of *Fourqurean v. Nat'l Collegiate Athletic Ass'n.*, 143 F.4th 859 (7th Cir. 2025). In many ways, for better or worse, as binding precedent it dictates the result here.

Similar to Coly, the plaintiff in *Fourqurean* sought to play a fifth season of college football after two seasons of play at the DII level and two seasons at the DI level. *Id.* at 865. After the NCAA rejected a waiver request of the five-year rule submitted by the University of Wisconsin on Fourqurean's behalf, he sought and received a preliminary injunction of the NCAA's eligibility rules from a district judge in Madison. *Id.* Over a persuasive dissent from Judge Ripple, the Seventh Circuit reversed the district court's grant of a preliminary injunction.

The Seventh Circuit first took issue with the district court's conclusion that *NCAA v. Alston*, 594 U.S. 69 (2021) conclusively established Division I FBS football as the relevant market. *Id.* at 870. In *Alston*, the Supreme Court affirmed a district court ruling that NCAA limits on certain education-related compensation or benefits violated

12

the Sherman Act. The Seventh Circuit explained that the Supreme Court in *Alston* did not itself define the relevant market. Instead, the Supreme Court noted that the parties did not challenge the district court's definition, which (in part) included FBS football. *Fourqurean*, 143 F.4th at 870. Moreover, the Seventh Circuit reiterated that evaluating a Sherman Act violation required careful analysis of market realities and acknowledged the substantial change to college sports post-*Alston*. *Id.* The majority disagreed with the dissent's view that Fourqurean's allegations that "the NCAA and its member institutions control the highest and most popular level of collegiate athletics" and that the NCAA possesses "a dominant position in the relevant market" were sufficient to define the market. *Id.* The *Fourqurean* majority concluded that a party seeking the extraordinary remedy of a preliminary injunction needs to present more than the bare allegations of a complaint. *Id.* This is because the preliminary injunction inquiry is a "decidedly far more searching inquiry than the question of whether a complaint properly alleges a claim for relief." *Id.* (*quoting In re Fed. Bureau of Prisons' Execution Protocol Cases*, 980 F.3d at 134.). In the majority's view, Fourqurean's "sparse and conclusory allegations" were insufficient to support a preliminary injunction. *Id.*

The Seventh Circuit also found Fourqurean's evidence of anticompetitive effects insufficient. Fourqurean argued the NCAA's eligibility rules were anticompetitive because they excluded him from participating in college football. *Id.* at 868. To determine whether an agreement to exclude is an unreasonable restraint, courts "consider its potential to deprive the public of the benefits of competition, especially competitive prices, taking into account market power and market structure." *Id.* at 869.

The Seventh Circuit explained that the usual antitrust concern for restraints that exclude competitors "is that the parties to the agreement are trying to create, protect, or enhance a dominant position in the market." *Id.* Under this theory, the plaintiff must prove that the agreement "is likely to keep at least one significant competitor of the defendant from doing business in a relevant market" and that "the anticompetitive effects (if any) of the exclusion outweigh any benefits to competition from [the exclusion]." *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 394 (7th Cir. 1984). Therefore, the threshold questions "are the relevant market and the defendant's market share." *Fourqurean*, 143 F.4th at 869.

In the context of the NCAA's eligibility rules and anticompetitive effects under this exclusion theory, the Seventh Circuit reasoned Fourqurean would need to show that the rules "creates, protects, or enhances the NCAA's dominant position in the market—and thus the NCAA's ability to depress student-athlete compensation below the competitive level—by making it more difficult for the NCAA's existing or potential rivals to compete against the NCAA." *Id.* at 870. Fourqurean's only evidence was his own exclusion from participating in college football. *Id.* The Seventh Circuit explained that Fourqurean was not a rival of the NCAA and had not "drawn a link from his exclusion to an adverse effect on an existing or potential rival of the NCAA." *Id.*

Concerning the effect of the NCAA eligibility rules on compensation, the majority noted that, under ordinary principles of supply and demand, restraints on the supply of workers would increase, not decrease, worker compensation. *Id.* at 871. The majority acknowledged that the Five-Year Rule may operate differently, but

14

Fourqurean offered no evidence to support his theory that the eligibility rules depressed athlete compensation by pushing out the most experienced players. *Id.* Although Fourqurean hadn't presented enough in the Seventh Circuit's mind to justify the grant of a preliminary injunction, the Seventh Circuit recognized that on remand his theories could still carry the day; he just needed a fuller evidentiary record. *Id.*

A few months after *Fourqurean* was decided, the Third Circuit considered the same issue in *Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407 (3d Cir. 2025). *Elad* concerned a Rutgers football player's challenge to the NCAA's eligibility rules that counted his one season of play at a Junior College ("JUCO") towards his four seasons of play across five years. *Id.* at 411. The plaintiff had played only three seasons of NCAA DI football. *Id.* Rutgers recruited Elad from the transfer portal and helped him secure an approximately $500,000 NIL deal. *Id.* at 412. After the NCAA denied Rutgers' request for a waiver to permit Elad to play another season, Elad filed suit and received a preliminary injunction from the district court. *Id.* The NCAA promptly appealed.

The Third Circuit vacated the district court's preliminary injunction and remanded the case for further proceedings. The Third Circuit found the district court "failed to define the relevant market altogether; it never made any factual findings regarding the market." *Id.* at 416. Instead, the district court recited the market definition provided by Elad's expert: "the labor market for college football athletes in general and NCAA Division I football specifically." *Id.* The Third Circuit found two errors with this approach. First, the Third Circuit found the district court did not engage in the "fact-specific analysis of the relevant market[.]" *Id.* And second, the Third Circuit determined

15

the expert's analysis to be faulty. The expert exclusively relied on *Alston* to define the relevant market and cited no evidence or economic data. *Id.* Moreover, the Third Circuit found the expert's unsupported market findings predated the shift in the college football market after *Alston. Id.* at 417. The Third Circuit encouraged district courts to conduct detailed market analysis that accounted for changing market realities. *Id.*

The Sixth Circuit has also addressed the issue of the NCAA eligibility rules in the antitrust context. *See Pavia v. Nat'l Collegiate Athletic Ass'n*, 154 F.4th 407 (6th Cir. 2025). Though the appeal had been rendered moot by the time it reached the Sixth Circuit, two concurrences in *Pavia* are worth discussion. Pavia, the then quarterback for Vanderbilt, sought an extra season of eligibility and to enjoin the NCAA from crediting his years of JUCO play towards his eligibility. *Id.* at 410. Pavia got his injunction, but the NCAA later issued a blanket waiver to all players in Pavia's position that permitted them to play in the 2025 college football season. *Id.* at 411. The Sixth Circuit determined the "Pavia Waiver" mooted the NCAA's appeal. But Circuit Judges Thapar and Hermandorfer each wrote interesting and helpful concurrences that serve to highlight the many evidentiary questions that are raised when challenging the NCAA's eligibility rules.

Judge Thapar noted Pavia and his expert pointed to two possible relevant markets: (1) the labor market for DI college football and (2) the labor market for college football generally. *Id.* at 416 (Thapar, J., concurring). Judge Thapar was not impressed by Pavia's evidence or the specificity with which he defined either market. *Id.* Judge Thapar also encouraged Pavia to flesh out his theory of antitrust behavior, noting Pavia

16

had floated both refusal to deal and boycott theories. *Id.* Judge Thapar explained that records of anticompetitive harm in antitrust cases typically requires a "voluminous record." *Id.* Pavia suggested the NCAA's rules gave NCAA schools an advantage over JUCOs in recruitment because players lose NCAA eligibility by choosing a JUCO. *Id.* But Judge Thapar noted Pavia had not introduced statistics or studies to support that theory and failed to identify DI labor market effects that stemmed from the exclusion of JUCO players. *Id.* at 416–17. Judge Thapar closed with a warning on the numerous line drawing problems inherent in college athletics rules and urged judicial restraint in this arena. *Id.* at 418.

Judge Hermandorfer's concurrence focused on the potential anticompetitive impact of the NCAA's eligibility rules on the labor market for DI football. In my opinion, Judge Hermandorfer's framing of the issues and economic questions hits the nail on the head. In Judge Hermandorfer's view, it matters less how the JUCO rule affects the decisions of where high-school football players choose to start their college careers and more how excluding experienced JUCO players from NCAA competition effects the DI football labor market. *Id.* at 420 (Hermandorfer, J., concurring). Citing *Fourqurean*, Judge Hermandorfer explained that there were reasons to doubt the standard principle that reduced supply would increase wages in the DI football labor market. *Id.* at 420–21. That's because "football prowess and productivity are not distributed uniformly across players." *Id.* at 421. This is a recognition of the obvious: college football players are not "fungible", meaning that their skills are not easily interchangeable in the labor market of college football players. Anyone who watched

17

Indiana Quarterback Fernando Mendoza lead the Hoosiers to an undefeated season and national championship this past season understands as much. Judge Hermandorfer reasoned that top players could command higher compensation and generate increased wage competition. *Id.*

This Court finds several important takeaways from the appellate commentary in *Elad*, *Pavia*, and *Fourqurean*. First, defining the relevant market is not a chip shot field goal. *Alston* did not define DI FBS college football as the relevant market for Sherman Act claims for time in memoriam. Indeed, the Supreme Court left undisturbed the district court's definition of the relevant market, which it reached only after a 10-day bench trial that featured numerous expert and lay witnesses. *Alston*, 594 U.S. at 80. This is especially true of the college athletics landscape post-*Alston* in which the infusion of NIL money requires updated evidence on current market conditions. Second, to receive a preliminary injunction plaintiffs must identify a clear theory of antitrust harm and support that theory with a well-developed record of anticompetitive effects. Finally, these cases echo *Alston*'s caution that judges should be wary to regulate markets absent clear evidence and definition because we are "neither economic nor industry experts." *Id.* at 102. With these guideposts, I now turn to Coly's allegations and evidence.

Coly says the relevant market is the nationwide labor market for NCAA DI football player services. [DE 2-1 at 13.] In support of this definition, Coly points to the following pieces of evidence—all of which come from his Complaint. Coly notes that former NCAA players comprised the entire 2023 NFL Draft class and explains that more than 99% of all NIL dollars are paid to DI athletes. [DE 1 at ¶¶74–75.]

Additionally, less than 0.2% of the approximately $1.1 billion NIL market for college football went towards non-DI players in 2024. [*Id.* at ¶32.] Coly cites the new revenue sharing framework established by the *House v. NCAA* settlement wherein DI FBS schools are expected to dole out over $20 million in direct payments to athletes for the 2025-2026 academic year. [*Id.* at ¶79.] Coly also generally cites to his own affidavit in which he says DI football provides unmatched development, training, media exposure, NIL compensation, professional development, and scouting opportunities. [*Id.* at ¶¶7, 23, 28–31, 74–75.]

Here, Coly does more than the plaintiff in *Fourqurean* because he does not simply point to *Alston* for his market definition. Coly's evidence of the disproportionate allocation of resources and money that pools at the DI level of college football paints a convincing picture that DII, DIII, and non-NCAA institutions (such as NAIA) are unlikely to be reasonable substitutes for DI college football. However, Coly's evidence and argument are lacking on why other leagues such as the NFL, United Football League, or Canadian Football League are not reasonably interchangeable substitutes. Those may be farfetched substitutes, but Coly does not address these leagues in the market definition in his opening brief and in reply only notes that the NFL is foreclosed to most DI players because of the NFL's collective bargaining agreement. The Court understands Coly to be referencing the NFL's rule that a player must be three years removed from high school to enter the annual NFL Draft, but Coly has satisfied this requirement.

Coly's allegations and general outline of the training and compensation available in D1 college football are insufficient to establish a relevant market. As I see it, I am bound by *Fourqurean*, in which the Seventh Circuit determined that similar "sparse and conclusory allegations" were insufficient to define the relevant market in support of a request for a preliminary injunction. 143 F.4th at 870. What's more, unlike the plaintiffs in *Fourqurean* and *Elad*, I did not have the benefit of expert or lay witness testimony at the March 3 preliminary injunction hearing to help shape the contours of this proposed market definition. Coly's allegations and thin evidence may be enough to rule out DII, DIII, and non-NCAA college football as interchangeable alternatives to DI college football, but he fails to sufficiently address other alternatives (such as the NFL, CFL and UFL). With additional evidence, especially expert testimony, Coly may well have satisfied this burden. *See Patterson*, 2026 WL 115417 at *6 (accepting the definition of NCAA DI FBS football as the relevant market over the NCAA's objections where plaintiff provided an expert witness declaration in support of his motion).

But there are other problems with Coly's case. Even if I were to accept Coly's market definition, his lack of economic data and analysis in support of anticompetitive effects shuts the door on his request for injunctive relief. Coly claims four anticompetitive harms: (1) artificial constriction of the labor supply in DI football; (2) suppression of competition among DI programs for athlete services; (3) distortion of mobility and recruiting competition; and (4) harm to consumers of DI football. In analyzing these alleged harms, the Court is mindful of the Seventh Circuit's instruction in *Fourqurean* that relying solely on an *individual player's* exclusion from participating in

20

college football does not demonstrate harm *to the market.* 143 F.4th at 870. Rather, a player who seeks to establish the theory of anticompetitive effects (as Coly does here) must show the NCAA's eligibility rules enhance, protect, or create a dominant position for the NCAA in the market, suppress athlete compensation below competitive levels, or harm the NCAA's potential rivals. *Id.*

Coly's theories present plausible anticompetitive harms. But he lacks *economic evidence* or analysis for these theories to demonstrate a substantial likelihood of success on the merits. Coly's first two theories share a similar argument that the reduction in the supply of former non-NCAA athletes who have exhausted their eligibility will decrease market competition and compensation. But this argument lacks the connection to a harm in output, price, or quality in the relevant market. *See Am. Express Co.*, 585 U.S. at 542. Just as plausible is that a reduced supply of DI football caliber athletes would increase competition amongst schools for this smaller pool of athletes. Indeed, "it may be the case that the supply of eligible players already outpaces demand", which means that additional supply would be unlikely to expand market compensation. *Patterson*, 2026 WL 115417 at *6.

Coly's theory that the NCAA's eligibility rules penalize and discourage athletes from attending NAIA and other non-NCAA institutions because those years will chew up NCAA eligibility presents another interesting theory of harm that further evidence may support. But Coly offers no concrete evidence in the form of enrollment and transfer data or any other economic analysis on the relationship between non-NCAA and NCAA institutions to support this claim. *See Boyd*, 2025 WL 2432200 at *6 (noting a

21

similar theory alleged by a former NAIA athlete and concluding it lacked evidence and analysis of how counting of time at NAIA colleges harmed the proposed market). Coly also does not explain how providing non-NCAA players additional years of NCAA eligibility will increase the NCAA's competition for such athletes, many of whom may never become DI-caliber players. Indeed, Coly's own progression demonstrates that DI schools still do recruit NAIA and non-NCAA transfers to their rosters each year. It is not clear what effect that limits to the number of years non-NCAA players are eligible for NCAA transfer and play has on Coly's proposed market.

I do not foreclose the possibility that, on a more developed record, Coly may be able to prove his theories of anticompetitive harm. The Court notes the open questions above not to cast doubt on the future vitality of Coly's theories but rather to show that he has not supported them to a level necessary to demonstrate a likelihood of success on the merits and the entitlement to the extraordinary remedy of a preliminary injunction. In fact, both *Patterson* and *Boyd*, opinions that I find persuasive, involved testimony or affidavits from expert economists on these issues that the courts still found lacking in explaining the anticompetitive harms of similar theories. Regrettably, our case doesn't have insufficient evidence; it has virtually no evidence at all—at least not at this point.[6]

********

---

[6] Because this Court has found Coly failed to demonstrate a likelihood of success on the merits, it does not reach the NCAA's separate argument that Coly's membership in the *House* settlement class waives his right to injunctive relief here.

22

There is a lot to wonder about when it comes to NCAA rules and how they are implemented. Indeed, given how much money is at stake for these young athletes, it's scarcely a surprise that there has been an avalanche of litigation against the NCAA.[7] That litigation is surely the result, in part, from some curious decisions by the NCAA. This year, there was a 30-year-old freshman on Arkansas' football team.[8] Next year a Montana football player will be playing in his *ninth* year of college football.[9] Hundreds of athletes benefitted from the COVID-19 blanket waiver issued by the NCAA for the 2020 season and got an extra year of eligibility.[10] But athletes like Mr. Coly who were also adversely impacted by COVID, albeit a year later, received no such consideration. There are scores of other oddities in how the NCAA implements its eligibility rules. Take Diego Pavia, who played six years of college football (two in JUCO, two at New Mexico State, and two at Vandy). *Pavia*, 154 F.4th at 410. Pavia got to play because the NCAA thought it fair to create a blanket waiver for athletes in that one year—2025. *Id.* at 411. So, if Mr. Coly had been in the system a year earlier, he too would have gotten the benefit of the so-called "Pavia Waiver." But alas, Mr. Coly was a day (actually a year) late and he's now a dollar (actually many dollars) short. I'm not sure how any of this makes sense.

---

[7] *See* https://www.collegesportslitigationtracker.com/tracker (last visited Mar. 22, 2026).

[8] Jackson Fuller, *Why former MLB player Monte Harrison returned to school and joined Arkansas football*, Fort Smith Southwest Times Record, Aug. 4, 2025, https://www.swtimes.com/story/sports/college/sec/2025/08/04/arkansas-football-monte-harrison-brewers-mlb-30-years-old/85458384007/ (last visited Mar. 22, 2026).

[9] Montana LB Tuliaupupu granted 9th year of eligibility by NCAA, ESPN, Feb. 10, 2026, https://www.espn.com/college-football/story/_/id/47890602/montana-lb-tuliaupupu-granted-9th-year-eligibility-ncaa (last visited Mar. 22, 2026).

[10] Heather Dinich, NCAA votes to give extra year of eligibility to Division I fall athletes, ESPN, Aug. 21, 2020, https://www.espn.com/college-sports/story/_/id/29712267/ncaa-votes-give-extra-year-eligibility-division-fall-athletes (last visited Mar. 22, 2026).

But I don't run the NCAA. And I am mindful of what the Supreme Court in *Alston* told judges when considering NCAA rules under the Sherman Act: "[C]aution is key. Judges must resist the temptation to require that enterprises employ the least restrictive means of achieving their legitimate business objectives. Judges must be mindful, too, of their limitations – as generalists, as lawyers, and as outsiders trying to understand intricate business relationships." *Alston*, 594 U.S. at 106. I agree that "judges should tread carefully in this area and insist on a thorough record from which to rule." *Pavia*, 154 F.4th at 418 (Thapar, J., concurring). I understand that requiring a fulsome evidentiary record places a difficult burden on athletes who find themselves litigating these cases under difficult circumstances with impending deadlines such as the NFL Draft. But by the same token, there was nothing preventing this lawsuit from being filed a year ago so it could have been fully litigated in time. In all events, on the present state of the record, I do not believe Coly has met his burden of showing an entitlement to a preliminary injunction.

### Conclusion

For the reasons stated, Plaintiff Atium Coly's Motion for Temporary Restraining Order and Preliminary Injunction [DE 2] is **DENIED**.

SO ORDERED.

ENTERED: March 23, 2026.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT

24